IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHARLES RICE KENDALL and ANN P. HOCHBERG, as Trustees for The Thomas E. Proctor Heirs Trust, <br><br> Plaintiffs, <br><br> v. <br><br> INTERNATIONAL DEVELOPMENT CORP., <br><br> Defendant. | Civil Action No. |

# COMPLAINT

Plaintiffs Charles Rice Kendall and Ann P. Hochberg, the Trustees of the Thomas E. Proctor Heirs Trust (the "PHT"), for their Complaint against Defendant International Development Corporation, allege the following:

1. Plaintiffs and Defendant have a dispute as to the title to the subsurface estate of 8 tracts of land identified by warrantee names of Mark J. Biddle, John Adlum, John Barron, Sr., John Barron, Jr., Clement Biddle, Benjamin Pennington, Collinson Reed, and James Shoemaker all located in Bradford County, Pennsylvania (the "Premises"). Therefore, Plaintiffs seek a determination that the PHT owns the oil, gas, and mineral rights to the Premises.[1]

---

[1] A related case involving the determination of title to the oil, gas and mineral rights to the Premises as between the PHT and the Pennsylvania Game

1

## THE PARTIES

2. The PHT is a trust for the benefit of numerous heirs of Thomas E. Proctor, Sr. whose current trustees are Ann P. Hochberg and Charles R. Kendall. Pursuant to the trust document, the trustees of the trust have the authority to sue and be sued and prosecute and defend any and all actions affecting the trust or its property.

3. Plaintiff Charles Rice Kendall, co-trustee of the PHT, is an adult individual domiciled in Maine.

4. Plaintiff Ann P. Hochberg, co-trustee of the PHT, is an adult individual domiciled in Massachusetts.

5. Upon information and belief, Defendant International Development Corporation ("IDC") is a Maryland corporation with its principal place of business in Maryland.

---

Commission is pending at *Commonwealth of Pennsylvania, Pennsylvania Game Commission v. Thomas E. Proctor Heirs Trust*, Civil Action No. 1:12-cv-1567 (M.D. Pa) (Conner, J.).

## JURISDICTION AND VENUE

6. Jurisdiction is proper pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of costs and interest, and there is complete diversity of citizenship between Plaintiffs and Defendant.[2]

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 as the property that is the subject of the action is situated in this judicial district and a substantial part of the events giving rise to the claims occurred in this judicial district.

## FACTUAL BACKGROUND

8. The PHT is a holder of the interests of the heirs of Thomas E. Proctor ("Proctor"), an entrepreneur in the leather business who died in December 1894.

### I. The Proctor and Hill Holdings

9. By deed dated June 5, 1893, Schrader Mining & Manufacturing Co. conveyed a total of forty-five tracts (collectively, the "Schrader Lands"), including

---

[2] The citizenship of the trustees is utilized for diversity purposes where, as here, the action is brought in the names of the trustees and the trustees have the right to sue and be sued on behalf of the trust. *See, e.g., Navarro Savings Association v. Lee*, 446 U.S. 458, 464-66, 100 S.Ct. 1779, 1783-84 (1980); *Emerald Investors Trust v. Gaunt Parsippany Partners*, 492 F.3d 192, 201-02 (3d Cir. 2007).

the Premises, to Thomas E. Proctor and Jonathan A. Hill ("Proctor & Hill"). *See* Bradford County Deed Book 197, page 270.

10. By deed dated October 27, 1894 (the "Union Tanning Deed"), Thomas E. Proctor and his wife Emma H. Proctor, and Jonathan A. Hill and his wife Lucy M. Hill, conveyed the surface estate of 39 of the 45 tracts contained within the Schrader Lands, including the Premises, to Union Tanning Co. (collectively, the "Union Tanning Lands.") *See* Bradford County Deed Book 205, page 436.

11. Proctor & Hill reserved "all the minerals, coal, oil, gas, or petroleum" (the "Subsurface Estate") from the lands conveyed to Union Tanning.

12. Specifically, the Union Tanning Deed provides that:

> And the same grantors herein Thomas E. Proctor and Jonathan A. Hill hereby expressly reserve, and save to themselves their heirs and assigns, all the minerals, coal, oil, gas, or petroleum found now or hereafter, on or under the surface of any or all of the lands described in each of the above mentioned parts or divisions, and conveyed by this Indenture, together with the right and privilege of ingress, egress, and regress upon said lands for the purpose of operating or developing, working, or removing the same.

13. In the Union Tanning Deed, Proctor & Hill specifically retained the fee, less bark rights, for four tracts - the Henry Beck, John Graff, Thomas Dundas and James Biddle warrants (collectively, the "Proctor & Hill Retained Lands").

14. The Union Tanning Deed was recorded with the Bradford County Recorder of Deeds in Deed Book 205 at page 436.

**II.     The Transaction Severing the Subsurface Was Reported**

15.     Under the Act of March 28, 1806, P.L. 644, the grantee to a deed severing the surface from the subsurface had the duty to report its ownership interest to the county commissioners. *Herder Spring Hunting Club v. Keller*, 143 A.3d 358, 372 (2016).

16.     The transaction involving the conveyance of lands from Proctor & Hill to Union Tanning was reported to the Bradford County Commissioners pursuant to the Act of March 28, 1806, P.L. 644.

17.     Reporting was performed at the county level, but the County Commissioners would enlist assessors for each township to assess the taxable persons and properties within each township.  The County Commissioners would send a letter or a recapitulation statement along with an assessment book to the township assessors.  The recapitulation statement provided instructions to the assessors.  The township assessors would return the township books to the County Commissioners, who would then compile the County Assessment book from the information received from each township.

18.     Beginning in 1894, the Bradford County Assessment records reflect that the taxes on the Schrader Lands, including the Premises, were paid by Union Tanning Co.

19. In the following years, the Bradford County Assessment records reflect the reporting of the ownership of the Union Tanning Lands and Proctor and Hill Retained Lands.

20. For example, the 1899 LeRoy Township assessment records list the Union Tanning Lands under the heading "Unseated Lands in Warrantee Names assessed to Union Tanning Co." Similarly, the Proctor & Hill Retained Lands are listed under a heading "Unseated Lands assessed to Proctor & Hill."

21. In addition, the 1900 Bradford County Assessment records for LeRoy Township contain notations adjacent to the warrants in the township column noting "UT Co" for the properties owned by Union Tanning and "P&H" for the Proctor & Hill Retained Lands reserved by Proctor and Hill in the Union Tanning Deed. The taxes for the "UT Co" lands were paid by Union Tanning and the taxes for the "P&H" lands were paid by "J.A. Hill."

22. The Act of 1806 required that the County Commissioners assess four times the amount of the tax that would otherwise have been due where the holder of the unseated land has failed to register. *See* Act of March 28, 1806, P.L. 644. No such four-fold taxation appears for any of the Warrants at issue in the assessment records, demonstrating that the land was registered.

### III. CPLC Reported Its Interest in the Surface Estate

23. In 1903, CPLC was formed to take over the land and lumber interests of the Penn, Elk and Union Tanning companies, which comprised several hundred thousand acres.

24. By deed dated May 25, 1903 (the "Union-CPLC Deed"), Union Tanning conveyed all of its lands owned in Bradford and Sullivan Counties, including the Premises, to CPLC. Union Tanning retained the bark rights and the deed was made subject to the Proctor & Hill reservation.

25. The Union-CPLC Deed was recorded with the Bradford County Recorder of Deeds in Deed Book 251 at page 520.

26. Following CPLC's acquisition of the Union Tanning Lands, CPLC is identified as the owner of the lands in the township and county assessment records.

27. Specifically, the 1907 assessment for LeRoy Township lists "C.P.L.Co" in the remarks column for all the warrants owned by CPLC and previously owned by Union Tanning.

28. Between 1894 and 1907, none of the warrants conveyed to Union Tanning and CPLC were ever assessed "four times the amount of tax to which such tract or tracts of land would otherwise have been liable" as was required if there was a failure to report ownership to the County Commissioners. Thus, both

Union Tanning and CPLC reported their ownership interests to the Bradford County Commissioners.

### IV. CPLC Has Its Attorney Purchase the Premises at a Tax Sale

29. Following its acquisition of the Union Tanning Lands, CPLC began paying the taxes on the surface estate of those properties. However, CPLC did not pay the 1907 taxes on 45 warrants, including the surface estate of the Premises, in Bradford County and allowed those warrants to be sold at a tax sale in June 1908.

30. At the time of the tax sales, CPLC was the owner of the assessed properties.

31. As the owner of the properties, CPLC had the duty to pay the taxes assessed on the properties.

32. Pursuant to the Act of June 6, 1887, CPLC had the duty to pay the taxes assessed on the properties.

33. On June 8, 1908, Calvin H. McCauley Jr. purchased the 45 warrants owned by CPLC, including the Premises, at the tax sale.

34. In the years immediately following the tax sale, CPLC continued to pay the taxes on those 45 warrants.

35. In 1910, McCauley Jr. quitclaimed the 45 warrants, including the Premises, back to CPLC for $1.

36. McCauley Jr. was the son of C.H. McCauley, who was the General Solicitor, a director, and the largest shareholder of CPLC at its inception in 1903.

37. From 1903 to 1917, McCauley Jr. held multiple roles with CPLC, each with significant levels of responsibility.

38. At CPLC's inception in 1903, McCauley Jr. was identified as CPLC's treasurer.

39. He also served as CPLC's real estate agent for several years from 1903 until 1908.

40. In February 1908, mere months before the tax sale at issue, McCauley Jr. was admitted to the bar of Lycoming County and appointed as CPLC's Assistant General Solicitor.

41. In the years following his promotion to Assistant General Solicitor, McCauley Jr. continued to represent CPLC in real estate matters.

42. In April 1911, McCauley Jr.'s relationship with CPLC culminated with his election to the board of directors while still continuing his role as Assistant General Solicitor.

43. Between 1904 and 1914, McCauley Jr. purchased at tax sales hundreds of properties, comprising hundreds of thousands of acres of land, owned by CPLC.

## V. The CPLC Tax Sales Did Not Alter Title to the Subsurface Estate of the Premises

44. Because CPLC correctly reported its interest in the surface estate only of the Premises, any taxes assessed in the name of CPLC encompassed only the surface estate and not the Subsurface Estate.

45. Because CPLC had the duty to accurately report its interest in the surface estate only of the Premises, it could not benefit from any breach of that duty to report.

46. Additionally, because CPLC had the duty to pay taxes on the properties it owned, it could not benefit from any breach of that duty to pay taxes.

47. The McCauley tax sales and tax deeds did not affect the title of the Proctor and Hill heirs because the alleged outstanding taxes on the subject properties were paid by an agent of CPLC, which effectuates a "redemption" under the law.

48. The McCauley tax sales and tax deeds did not affect the title of the Proctor and Hill heirs because the Proctor and Hill heirs did not receive constitutional notice prior to the purported deprivation of their property.

49. CPLC and its agents are estopped from acquiring a greater interest in the property as a result of CPLC's own failure to register its ownership of the surface estate to the taxing authorities and failure to pay the assessed taxes.

50. CPLC, and all of its successors in interest, are estopped from claiming that the assessment of taxes included the Subsurface Estate as CPLC had the obligation to register its ownership of only the surface estate of the Premises.

51. Because CPLC and McCauley, as CPLC's agent, were not bona fide purchasers at the time of the tax sales and subsequent quit claim deeds, they and any parties who claim through them, could not acquire a greater interest in the property as a result of CPLC's own failure to report its interest or pay the assessed taxes.

52. In the alternative, the tax sales were void, invalid, and passed no title to the Proctor Subsurface Estate, because the notice provisions of the Act of 1815, on their face or as applied, violate the due process rights of the Proctor heirs as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.

**VI.   IDC Claims Title to the Subsurface Estate of the Premises**

53. By deed dated December 14, 1920, CPLC conveyed 19 Warrants, including the Premises, to the Pennsylvania Game Commission (the "CPLC-PGC Deed").

54. The 1920 CPLC-PGC deed was made "subject to all the minerals, coal, oil, gas or petroleum found now or hereafter on, or under the surface or any

or all of the lands…as fully as said minerals and mineral rights were excepted and reserved in deed…from Thomas E. Proctor et al."

55. In the early 1940s, CPLC was liquidated and its assets were distributed to subsidiaries of its parent company United States Leather Company ("US Leather").

56. Specifically, as part of the liquidation process, in August 1942, CPLC quitclaimed its interests "if any" in certain properties, including the Premises, in Bradford County to subsidiaries of US Leather, including Keystone Tanning & Glue Co. ("Keystone").

57. On or about October 29, 1943, Keystone quitclaimed the same supposed interests to Keta Realty Company, another subsidiary of US Leather which later changed its name to Keta Oil and Gas ("Keta").

58. Following liquidation, Keta was acquired by Swan-Finch in 1955.

59. In the early 1960s, Swan-Finch and its subsidiaries, including Keta, filed for bankruptcy.

60. In 1966, the bankruptcy trustee issued a quitclaim deed of any purported oil, gas and mineral interests Keta may have had to Astra Oil & Gas Corporation.

61. The quitclaim deed from the bankruptcy trustee provides that the trustee "does hereby release and quit-claim to said Grantee, its successors and

assigns, any and all gas, oil and mineral rights which said Grantor may have, but no greater right, title and interest of, in and to such gas, oil and mineral rights than is now held by the said Grantor….." The deed further disclaims any warranty.

62. Astra (then known as KGA Industries) quitclaimed the purported Keta oil and gas interests to Clarence W. Moore.

63. IDC claims its interests in the Premises through Moore.

64. In 2000, following Moore's death, his estate quitclaimed any purported gas, oil and mineral rights that the estate may have in the Commonwealth of Pennsylvania to IDC.

65. IDC claims title to the Subsurface Estate of the Premises through the CPLC-PGC Deed and its reference to the Proctor and Hill reservation.

66. IDC brought claims against the Pennsylvania Game Commission ("PGC") before the Board of Property seeking a determination that the reference to the Proctor and Hill reservation in the CPLC-PGC Deed prevented the PGC from acquiring the oil, gas and mineral rights in the Premises (the "BOP Proceedings").

67. The PHT was not named as a party to the BOP Proceedings.

68. On April 15, 2021, the Board of Property issued a final order finding in favor of IDC.

69. The PHT did not become aware of IDC's claim against the PGC or the BOP Proceedings until counsel for the PGC raised the issue during a telephonic

conference on December 22, 2021 in the case styled *Commonwealth of Pennsylvania, Pennsylvania Game Commission v. Thomas E. Proctor Heirs Trust*, Civil Action No. 1:12-cv-1567 (M.D. Pa).

70. On March 4, 2022, the Commonwealth Court affirmed the ruling of the Board of Property, but noted that resolution of that case did not determine title to the oil, gas and minerals under the Premises due to the countervailing interest of the PHT.

## COUNT I – QUIET TITLE

71. Plaintiffs hereby incorporate by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

72. Plaintiffs seek to quiet title to the oil, gas and mineral rights of the Premises to remove any cloud on their title to the Premises that has been created by Defendant's actions.

73. Plaintiffs hold title to the natural gas, oil and mineral rights contained in the Premises.

74. Defendant IDC claims title to the natural gas, oil and mineral rights in the Premises.

75. There is a cloud on Plaintiffs' title to the oil and gas rights in the Premises due to the actions taken by Defendant.

76. Defendant has made claims to ownership or has attempted to convey interests in the oil and gas associated with the Premises.

77. Plaintiffs seek a determination of title to the oil, gas and mineral rights within the Premises.

78. Neither Plaintiffs nor Defendant are in possession of the oil, gas or minerals within the Premises.

79. Plaintiffs seek a determination that title to the natural gas, oil and mineral rights of the Premises is vested in the PHT.

## COUNT II – DECLARATORY JUDGMENT

80. Plaintiffs incorporate by reference the foregoing paragraphs as though fully set forth herein.

81. A dispute exists between Plaintiffs and Defendant as to the ownership of the oil, gas and mineral rights within the Premises.

82. The PHT claims title to the Subsurface Estate of the Premises.

83. Plaintiffs hold title to the natural gas, oil and mineral rights contained in the Premises.

84. Defendant claims title to the natural gas, oil and mineral rights in the Premises.

85. An actual controversy exists between the parties as to the ownership of the Subsurface Estate of the Premises.

86. Plaintiffs seek a declaration that the PHT owns the natural gas, oil and mineral rights in the Premises.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendant as follows:

(i) That the Court enter an order declaring that the PHT is a rightful owner of all the natural gas, coal, oil, petroleum, marble and all minerals of every kind and character in, upon, or under the Premises;

(ii) That the Court enter an order compelling Defendant (i) to admit the invalidity of any leases or other instruments from Defendant to third-parties purporting to convey any right, title or interest in the Subsurface Estate of the Premises (ii) to surrender any claim to any right, title or interest in the Subsurface Estate of the Premises; and (iii) to file or record a document that confirms that the PHT is the rightful owner of the entirety of the Subsurface Estate of the Premises; and

(iii) That the Court grant such other relief as it shall deem just and equitable under the circumstances.

Dated: April 7, 2022                     Respectfully submitted,

<div style="margin-left: 50%;">

<u>/s/ Laura A. Lange</u>
Laura A. Lange
(PA 310733)
1670 Sturbridge Drive
Sewickley, PA 15143
847-800-8334
lange@proctortrust.com

Justin G. Weber (PA 89266)
TROUTMAN PEPPER
Suite 200, 100 Market Street
P.O. Box 1181
Harrisburg, PA 17108-1181
717.255.1155
717.238.0575 (fax)

*Attorneys for The Trustees of the Thomas E. Proctor Heirs Trust*

</div>